FUJIWARA AND ROSENBAUM, LLLC

ELIZABETH JUBIN FUJIWARA 3558
JOSEPH T. ROSENBAUM 9205
1100 Alakea St., 20th Fl., Ste B
Honolulu, Hawaii 96813
Telephone: 808-203-5436

Attorneys for Plaintiff
KRISHNAN GHOSH

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| KRISHNAN GHOSH,<br><br>Plaintiff,<br><br>vs.<br><br>ABBOTT LABORATORIES, ABBOTT LABORATORIES, INC, and CARDIOVASCULAR SYSTEMS, INC; JOHN DOES 1-10; JANE DOES 1-10; DOE CORPORATIONS 1-10; DOE PARTNERSHIPS 1-10; DOE UNINCORPORATED ORGANIZATIONS 1-10; and DOE GOVERNMENTAL AGENCIES 1-10,<br><br>Defendants. | CIVIL NO.<br>(Other Civil Action)<br><br>COMPLAINT; DEMAND FOR JURY TRIAL |

COMPLAINT

Plaintiff Krishnan Ghosh ("Plaintiff" or "Ghosh"), proceeding with his claims *pro se*, for his Complaint against Defendants Abbott Laboratories and Abbott Laboratories, Inc. ("Abbott"), and Cardiovascular Systems, Inc. ("CSI") (collectively, "Defendants"), states and alleges as follows:

**INTRODUCTION**

1. This action arises from the unlawful termination of Krishnan Ghosh, a Senior District Sales Manager for the territory of Hawaii and Guam, who discovered and repeatedly reported serious violations of federal healthcare fraud law and defrauding taxpayers — including the Federal Anti-Kickback Statute (AKS) and the False Claims Act (FCA). Plaintiff was fired four hours after making his final report.

2. Plaintiff is a highly decorated Medical Device professional who Defendants recruited and hired from Chicago, Illinois and relocated to work in Honolulu, Hawaii. Plaintiff's extensive industry experience is also what allowed him to correctly identify and report Defendants' violations of AKS and FCA, at State and National level.

3. Plaintiff documented multiple schemes by Abbott and CSI to illegally induce their users, including Pacific Vascular Institute ("PVI"), a major customer that routinely treated Medicare patients, to continue purchasing their products through: kickbacks in the form of illegally structured bundled discounts and

prebate arrangements, the retention and promotion of a former PVI employee whose continued employment served as an ongoing inducement to PVI, and the provision of free products and services outside any lawful contractual arrangement—schemes which were used nationally.

4. Rather than investigate or remediate the conduct Ghosh reported, Defendants — at the behest of PVI's Medical Director, who demanded Ghosh be terminated by end of day or risk losing PVI's business — fired Ghosh on May 31, 2023, without warning, without documentation, and without cause— one hour prior to a multi-state extension and expansion of the illegal contracts for PVI's network.

5. The State of Hawaii's own examiner subsequently concluded that Defendants failed to provide adequate reason for Ghosh's termination and that no cause or misconduct was shown. Ghosh's personnel file contained no termination-related paperwork, no reports of misconduct, and no documentation supporting the pretextual reasons Defendants offered months after Ghosh's wrongful termination.

6. This action is brought to hold Defendants accountable for retaliating against Ghosh for engaging in protected activity under the False Claims Act, 31 U.S.C. § 3730(h) by valid reporting violations defined by Anti-Kickback Statute 42 U.S.C. § 1320a-7b.

## PARTIES

7. Plaintiff Krishnan Ghosh is a former Senior District Sales Manager with Abbott and CSI, who began employment with CSI on February 20, 2023, lived and worked in Honolulu, Hawaii at all relevant times, and now resides in the state of Iowa.

8. Defendant Abbott Laboratories, (ABT) is a publicly held multinational corporation incorporated in Delaware with its principal place of business at 100 Abbott Park Road, Abbott Park, Illinois. Abbott completed its acquisition of CSI on April 27, 2023, at which point CSI became a wholly owned subsidiary of Abbott.

9. Defendant Abbott Laboratories, Inc. (ALI), a wholly owned subsidiary of Abbott Laboratories, is a corporation incorporated in Delaware with its principal place of business at 100 Abbott Park Road, Abbott Park, Illinois.

10. Defendant Cardiovascular Systems, Inc. (CSI), a wholly owned subsidiary of Abbott Laboratories, a corporation incorporated in Delaware with its principal place of business at 1225 Old Highway 8 NW, St. Paul, Minnesota.

11. Abbott became Ghosh's joint employer no later than April 27, 2023, and all relevant times following that date, Abbott and CSI acted jointly in decisions concerning Ghosh's activity, employment, compensation, and termination. Additionally, all relevant CSI employees, supervisors, directors, and illegal contracts were then held under Abbott subsidiary ALI following the acquisition,

thereby assuming all relevant obligations, relationships, and liabilities of CSI. All blended revenue from CSI and ALI's merged (legal and illegal) operations were immediately and publicly reported by Abbott (under NYSE ticker: ABT) following April 27, 2023.

**RELEVANT non-PARTIES**

12. HR Chief Steve Rempe, Plaintiff was personally contacted by Rempe to fortify Plaintiff's decision to work for CSI by fraudulently representing their current business practices and Abbott's pending acquisition was legal in nature—and that the reporting of all illegal activity and conflict of interest would be protected.

13. Director Ryan Hopkins, VP Raoul Quintero, VP Mike Paulsen, VP Mike Kubicek, all had direct knowledge of the *national* illegal kickbacks and illegal activity for which Plaintiff reported, as they all were required to report to their superiors.

14. Pacific Vascular Institute, Llc ("PVI"), also known as Pacific Vascular Associates, LLC ("PVA") and Pacific Vascular Institute-Kona (PVIK), are subsidiaries of Insight Vascular Consultants ("Insight")—a major customer of both CSI and Abbott before and after the Acquisition. PVI maintained illegal inducement contracts with both CSI and Abbott—PVI's Medical Director, Dr. Amr

El-Sergany, served as paid faculty for CSI and wished to combine Defendants' illegal inducements immediately after April 27, 2023, the acquisition date.

15. Nicole Woolsey was a CSI (now Abbott) Clinical Associate and former employee of PVI, and close personal friend of Dr. El-Sergany. Defendants assigned Plaintiff to work alongside Woolsey with full knowledge of the illegal activity she was facilitating with PVI on Defendants' behalf.

16. MIT Distribution Group was the first entity to recruit Plaintiff to work in Hawaii and finance El-Sergany and PVI's Office-Based Lab ("OBL") network.

**JURISDICTION AND VENUE**

17. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under a federal statute — the False Claims Act, 31 U.S.C. § 3730(h).

18. Venue is proper in this District under the False Claims Act's venue provision because the alleged prohibited conduct — the illegal kickback schemes and violations defined by Anti-Kickback Statute 42 U.S.C. § 1320a-7b which Plaintiff reported, Plaintiff's corrective actions, the retaliatory acts leading to his termination, and the employment relationship itself — all arose in the State of Hawaii, where Plaintiff lived and worked. Defendants also transact substantial business in this District.

19. Venue is independently proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in Hawaii.

## FACTUAL ALLEGATIONS

### A. Ghosh Joins CSI Shortly Before Abbott's Acquisition

21. From January 11th to January 31st, 2023, Defendants recruited, induced, and hired Plaintiff, while competing against at least two other companies (MIT and Inari) who were vying for his services. At all relevant times, all three companies and hiring managers who were recruiting Plaintiff, were aware THE ONLY reason Plaintiff was willing to relocate his entire life from Chicago to Hawaii to work for CSI, was to care for his parents, two healthcare workers who were suddenly stricken with end-stage disease in November of 2022.

22. Plaintiff entered into negotiations all three companies, and Plaintiff chose the opportunity which allowed him access and resources to care for his parents. On February 2, 2023, Ghosh signed the Employment Agreement with CSI. On February 20, 2023, Plaintiff began his employment with CSI as a Senior District Sales Manager assigned to the territory of Hawaii and Guam.

23. On February 8, 2023, six days after Ghosh signed the Employment Agreement with CSI, Abbott announced its intention to acquire CSI. Within minutes of the announcement, both MIT and Inari immediately again asked

Plaintiff if he would reconsider their offers given Abbott's pending acquisition of CSI.

24. At request of Regional Manager Drew Goldstein and Vice Presidents Mike Kubicek, Defendants' Chief Human Resources Officer Steve Rempe and HR Director Jim Belmonte then personally called and emailed Plaintiff to assure him that his position was secure despite the acquisition. Defendants were fully aware of the gravity of Plaintiff's personal (family) reasons for moving to Hawaii, along with the pending acquisition, coupled with the other companies competing for Plaintiff's services.

25. To mitigate revenue loss in a vacant District, Defendants requested Plaintiff accelerate his hire date from April 1, 2023, to February 20, 2023, to begin working in Hawaii as quickly as possible. Defendants then relocated Plaintiff from Chicago, Il, to live and work in the State of Hawaii on March 7th, 2023. Defendants provided myriad inducements to relocate, including signing bonus, moving bonus, and fixed income structure during the first six months of his employment.

26. Prior to employment, Defendants even promoted Ghosh to *Senior* District Sales Manager in recognition of his extensive experience, expertise, and unmatched qualifications as a tenured manager and endovascular clinician. At all

relevant times, Ghosh reported to Regional Sales Director Drew Goldstein, who reported to Vice President Mike Kubicek.

27. Vice President Kubicek and Regional Manager Goldstein explained, *"the previous District Manager of Hawaii made no less than $300,000.00 per year—other District Mangers make much more—CSI invests in their District Managers to retain their services because it costs Defendants over $2,000,000.00, on average, if a District Manager leaves due to lost relationship equity, loss of revenue in a vacant District, and cost of re-Certification and onboarding"*—Ghosh subsequently turned down the other job opportunities to relocate and work for Defendants due to these specific assurances.

28. On April 27, 2023, Abbott completed its acquisition of CSI while Plaintiff was working at CSI Headquarters in St. Paul, MN, and took possession of CSI's physical property and personnel. This Date was referred to as "Day Zero" internally at Abbott, with operational integration mapped out to the hour, for the following two weeks.

29. Plaintiff achieved his second Certification to perform coronary procedures in Hawaii on April 28th, 2023, while working at Abbott's new headquarters in St. Paul Minnesota, and Defendants promptly relocated Plaintiff back to Hawaii to meet with agents of Abbott who arranged dinner with him in Honolulu.

30. On May 3, 2023, Abbott then disclosed their contracts and business strategy to Plaintiff, including both CSI and Abbott's otherwise confidential illegal contractual inducements.

31. Each illegal inducement contract had the direct effect of both defrauding Hawaii tax-payers, as well as artificially inflating shareholder value in advance of, and during, Abbott's acquisition of CSI under SEC oversight.[1]

32. In the following weeks, Plaintiff immediately began taking corrective action to eliminate the illegal activity. Defendants then breached their contract, stripped Plaintiff of his negotiated employment rights, and illegally terminated, silenced, and stranded in Hawaii, without income, healthcare, home, nor job opportunity.

33. Plaintiff then spent a year in Hawaii unsuccessfully applying for jobs, as all previous medical device openings in Hawaii were either filled, restricted due to Plaintiff's non-compete clause in the employment agreement, or because Plaintiff simply did not get a chance to interview given Abbott's unfounded allegations which had infected the respective opportunity and hiring managers.

34. Through Defendants deliberate and malicious actions, Plaintiff's family was forced to put 24-hour care in place for his parents and 48-year-old

[1] https://www.sec.gov/Archives/edgar/data/1180145/000114036123013384/ny20007640x2_defm14a.htm

Ghosh had to move back to the mainland to find a job which would allow him to commute to Hawaii to care for his parents, while Defendants' baseless allegations of Plaintiff's misconduct rippled through the industry he served for decades.

**B. Abbott's and CSI's Violations of Federal Law**

**The Federal Anti-Kickback Statute**

35. The Federal Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b, prohibits giving or receiving any remuneration designed to induce referrals or to influence the prescribing, purchasing, or ordering of items and services paid for by federal healthcare programs. Remuneration includes anything of value, direct or indirect, including free products and services, regardless of minimum value. *If even one purpose of providing the remuneration is to induce business, the AKS is violated.*

36. False Claims Act, 31 U.S.C. § § 3729-3733 protects the Government from being overcharged or sold shoddy goods or services. It is illegal to submit claims for payment to Medicare or Medicaid that you know or should know are false or fraudulent. Filing false claims may result in fines of up to three times the programs' loss plus $11,000 per claim filed.

37. Criminal penalties and administrative sanctions for violating the AKS include fines, jail terms, and exclusion from participation in the Federal health care programs. Under the CMPL, physicians who pay or accept kickbacks also face

penalties of up to $50,000 per kickback plus three times the amount of the remuneration.

38. In the course of Plaintiff's employment, Ghosh discovered and reported four distinct schemes through which both Abbott and CSI violated the AKS, *resulting in hundreds (at least) of index events giving rise to FCA liability within state of Hawaii, and potentially hundreds of thousands FCA violations Nationally*.

39. Further, Defendants specific violations as reported by Plaintiff had the direct effect of illegal generation of publicly reported revenue which artificially inflates shareholder value, during an acquisition under Securities and Exchange Commission's (SEC) oversight.[2]

**CSI's AKS Violations Related to Nicole Woolsey**

40. Once hired, Plaintiff discovered CSI employed and retained Nicole Woolsey — a former PVI employee and close associate of PVI's Medical Director Dr. Amr El-Sergany — at significant cost and with significant business risk, for the purpose of inducing PVI's continued purchase of CSI's and Abbott's products — despite blatant conflict of interest and obvious nature of illegal activity.

41. CSI hired Woolsey away from PVI and then paid her to fly to different Islands on behalf of PVI, to arrange paid referral courses which then

[2] https://www.sec.gov/Archives/edgar/data/1800/000162828025007110/R16.htm

provided El-Sergany with more patients and more procedures, while using free devices. CSI then paid to El-Sergany to use their devices to perform his normal procedures on two separate occasions on back-to-back weeks under the guise of an educational course.

42. CSI modified its internal procedures so that all PVI requests were routed through Woolsey rather than through established sales channels, including Plaintiff. Woolsey would then send El-Sergany's requests for free products and paid referral programs directly to Regional Manager Goldstein for approval from VP Kubicek. Educational programs are traditionally facilitated by CSI Office of Medical Affairs.

43. Defendants facilitated Woolsey to arrange paid referral courses to drive business to her previous employer's OBL network in their new expansion sites of Hilo and Maui, Hawaii. As an example, Plaintiff discovered Woolsey arranged for two such referral courses for her ex-employer, back-to-back weeks, totaling $5760.00 in payments to El-Sergany—Woolsey, at the documented request of El-Sergany, then requested free samples to be used in each paid program.

44. In direct violation of AKS and FCA, at Dr. El-Sergany's request, Woolsey routinely provided PVI with CSI products free of charge — including balloons, crossing catheters, wires, and liquids — outside any contractual

arrangement and without appropriate documentation, thereby saving PVI significant costs with the intent to induce PVI to retain its business with CSI. On repeated occasions, Plaintiff reported these events and took documented corrective actions to remedy Woolsey's behavior.

45. Woolsey also regularly provided services free of charge, directly to PVI and Dr. El-Sergany, as well as other Hawaii OBL's such as Island Cardiovascular and Vein Center— including operating a C-Arm during medical procedures. Woolsey would regularly abandon her assigned territory to moonlight at PVI's facilities and other Hospitals and OBL's, with CSI's full knowledge of those actions.

46. Woolsey was also providing El-Sergany with confidential pricing of CSI products so he could negotiate with other companies to lower their prices. Further, Woolsey was routinely promoting competitive devices of equal indication and performance.

47. All of Woolsey's illegal activity and COI demanded immediate termination "for cause" under Defendant's National Policy, yet no action was taken. At every point, CSI should have mandated Woolsey be at an "arm's-length" from the clear conflict of interest (COI) with PVI—much less allowing her to organize paid referral programs, services, and free samples for her Ex-Employer—as this constitutes blatant violations of AKS and FCA.

48. Further Goldstein and Kubicek were well aware of these inducements and correlating purported outcomes of El-Sergany's procedures, and the alleged nickname of PVI as "the chop-shop" given the amputation rates.

49. At all relevant times during Plaintiff's employment in Hawaii, Ghosh either witnessed or learned of El-Sergany fracturing Abbott's devices in patient's legs, loss of patient's kidney, loss of patient's legs, needlessly rupturing asymptomatic aneurysms, and causing multiple arterial perforations requiring emergency surgery. Both Woolsey and Goldstein were aware of these events.

50. Despite Ghosh's repeated reports of Woolsey's illegal and policy-violating conduct, Defendants refused to discipline or terminate Woolsey. CSI's Human Resources Representative Jimmy Brigham affirmatively stated that Woolsey would not be reprimanded for any of her behavior. Instead, following Ghosh's unlawful termination, Defendants promoted Woolsey from Clinical Associate to Sales Representative with full knowledge of her pervasive illegal activity and conflicts of interest.

51. Abbott's history of rampant illegal activity and kickbacks were then well detailed six weeks after Plaintiff's illegal termination by the *New York Times* when they published *"They Lost Their Legs, Doctors and Health Care Giants Profited."*[3]

---

[3] https://www.nytimes.com/2023/07/15/health/atherectomy-peripheral-artery-disease.html

**CSI's Illegal Bundling Contract with PVI**

52. On March 2, 2023, Ghosh learned of CSI's discounted bundling contracts which were used as a national policy to grow and retain business while competing in the Outpatient Based Labs (OBL) vascular market. The contracts provide that: the more CSI handheld atherectomy devices PVI purchased, the more accessories — including wires and liquids — each OBL would receive at no charge. The OBL's would then use these no-charge products in procedures both related and unrelated to those of CSI.

53. Upon reviewing CSI's contract with PVI, Ghosh found that it listed wires and liquids at a stated cost of $0.00 if purchased in conjunction with handheld devices, while the actual-standalone cost of those same accessories was significantly higher as listed in the *fine print* of the contract. Such that, when Customers needed to buy those goods, outside of contracted terms, CSI would issue them for "free" regardless.

54. CSI had no procedures, labeling, or tracking mechanisms to differentiate products provided at zero cost from those provided at full price, leaving open the door for PVI to bill federal reimbursement healthcare programs — including Medicare— for items provided without charge. Abbott previously

settled with the government for $622 Million when a separate subsidiary engaged in nearly identical scheme in 2003.[4]

55. This bundling arrangement did not satisfy the AKS discount safe harbor at 42 C.F.R. § 1001.952(h) because, among other deficiencies, the free products were not appropriately documented, were provided in a manner that allowed PVI to invoice government programs for no-cost items and were structured to induce ongoing purchases rather than to reflect a lawful and disclosed discount.

56. In May 2023, Goldstein confirmed to Ghosh that he had additionally provided PVI with free wires outside even the terms of the contract — specifically, "an extra 50 viper wires at no charge" worth approximately "$10,000 in free viper wires" — to induce Dr. El-Sergany to sign a bulk purchase ordering contract.

57. Importantly, each free wire could be used by Dr. El-Sergany to generate procedural reimbursement from federal payors far exceeding the face value of the wire itself. CMS "reimbursement" is calculated on the requirement that the OBL facility actually pay for the devices and services which are used for each procedure. It is illegal to request tax-payers "reimburse" OBL's for goods and services which were obtained free of charge.

**CSI's and Abbott's Illegal Prebate Schemes**

[4] https://www.nytimes.com/2003/06/27/business/abbott-to-pay-622-million-to-end-inquiry-into-marketing.html

58. Ghosh learned that as an inducement to PVI to enter into a contract extension in May 2022, CSI had provided PVI with a supply of free wires outside the scope of the contract, in advance of product purchase payment — a "prebate" arrangement that falls outside the protections of the AKS discount safe harbor because the benefits were provided in advance of identifiable purchases.

59. On May 3, 2023, Abbott Manager Ryan Romero disclosed to Ghosh at a dinner meeting in Honolulu that Abbott had its own illegal prebate arrangement with PVI, under which Abbott loaned devices to PVI for federally reimbursable procedures, PVI billed the government for those procedures, and Abbott then issued PVI upfront cash "kickbacks" based on volume of products ordered — without receiving payment from PVI for up to six months.

60. Romero also disclosed to Ghosh that Dr. El-Sergany was seeking to combine CSI's and Abbott's respective contracts with PVI into a single, scaled arrangement following the Acquisition —where they proposed PVI would now get an additional cash kickback for every atherectomy device ordered—in addition to the free items, thereby compounding the illegal nature of the inducements.

61. This "flywheel" of illegal inducements facilitated PVI's cash flow and national expansion while creating ongoing, volume-based financial incentives to continue using Abbott's products. Each new expansion site for PVI, was effectively financed by Abbott, in order to grow the use of Abbott and CSI

products, thereby the increasing the amount of illegal publicly reported revenue with each purchase order (IOU), thereby artificially inflating shareholder value in advance of — and during, Abbott's acquisition of CSI.

**C. Ghosh's Protected Reports of Illegal Activity**

62. Ghosh made a sustained and documented series of reports of the illegal conduct described above to his supervisors and to CSI Human Resources. These reports included but are not limited to the following:

a) **March 2, 2023**: Ghosh discovered and reported to Goldstein his concerns about the legality of CSI's kit bundling pricing terms and national inducement contracts. Through Plaintiff's prior roles, he knew the complexity of legal bundling of items within Safe Harbor. Goldstein deflected, *"everything is handled on the back-end*" and that he would explain the bundling at a later date.

b) **March 24, 2023**: Ghosh reported to Goldstein that Woolsey was repeatedly requesting free samples to use in "educational courses" for El-Sergany. Goldstein was reluctant to issue any more free products to PVI, admitting that El-Sergany asked Goldstein to pay him for the two courses—which were actually illegal referral programs for PVI's expansion in Maui and Hawaii islands.

c) **March 31, 2023**: Ghosh reported to Goldstein that Woolsey had submitted a purchase order providing PVI with free wires outside the scope of the parties' contract. Goldstein confirms *"I saw the free wires. We shouldn't be giving them wires at no-charge unless they are buying the same amount of atherectomy devices."* Plaintiff then corrected Woolsey's issuance of free products to her former employer and discovers the illegal nature of CSI's contract language given CSI Customer Service stated, "*all wires are issued for free if the pricing matrix of the contract lists them as having no value."*

d) **April 27, 2023**: In one such documented meeting, Ghosh reported to both Goldstein and HR Representative Brigham that Woolsey's conduct — including the provision of free products, territory abandonment, case abandonment, getting kicked out of hospitals, and actions benefiting Dr. El-Sergany — violated CSI policy and implicated Federal Anti-Kickback law and giving rise to violations of False Claims Act — Plaintiff witnessed El-Sergany scanning each free item into his procedural charge sheet submitted for federal reimbursement.

e) **May 3, 2023**: The seminal meeting where agents from Abbott fly into Hawaii to meet with Plaintiff. Within thirty minutes of concluding his

dinner with Abbott, Ghosh texted Goldstein to report his concerns about Abbott's blatantly illegal prebate inducements— Abbott's desire to fold CSI's bundled contract of "free items" into Abbott's own "prebate" arrangement.

f) **May 4, 2023:** Ghosh detailed by phone to Goldstein his concerns about Abbott's prebate structure, including the fact that Abbott kicking back payments to PVI, despite being on "credit hold" for overdue payments. Goldstein acknowledged the contract *"did not sound legal"* and agreed to ask leadership VP Kubicek, Director Hopkins, and Abbott about the structure of their Prebate contracts.

g) **May 5, 2023**: Ghosh immediately contacts PVI's accounts payable agent, Shontell Beasley to request all money owed of $30,293.00 be paid to release PVI from credit hold. Ghosh then emails Woolsey to attain written assurance from El-Sergany that they are able to pay for the items used moving forward.

h) **May 9, 2023**: Ghosh again reported his concerns to Goldstein given the gravity of the combination of Abbott's proposed integration CSI's PVI contract, restating Abbott was *"cutting them a check per usage without*

*them ever paying."* Goldstein then told Ghosh he would continue to confer internally with leadership about Abbott's prebate contract.

i) **May 11, 2023**: Ghosh requests multiple contract changes to eliminate any and all language of the free items by assigning value to each item per product (SKU). Goldstein then arranged a conference with Ryan Hopkins, ALI's Regional Sales Director of Strategic Pricing and Contracts, specifically to discuss the inducement structure, contract language, and pending expiration of PVI's current contract. Goldstein asks Woolsey to join.

j) **May 18, 2023**: Ghosh reported to Goldstein that Woolsey had again executed a purchase order issuing PVI free wires outside contracted terms and proposed a formal audit of all free items provided to PVI, documented on text and email.

k) **May 22, 2023**: Ghosh reported his concerns via email to Goldstein, VP Kubicek, and Ryan Hopkins, requesting to change PVI's current contract renewal/amendment terms and language from illegal to legal, and proposing an alternative, legally compliant tiered pricing structure, and proforma strategy to eliminate illegal inducements. Ghosh followed up

with a recorded voice memo to which Goldstein replied with *"let's just focus on getting a signature [to extend contract]"*

l) **May 23, 2023**: Ghosh meets with his Goldstein and his teammates in California at Harvest Restaurant at 6:15pm and again describes in detail the May 3rd, 2023, meeting with Abbott. Ghosh reported their illegal prebate kickbacks, warning his Regional team of Abbott's intentions to combine CSI inducements with Abbott's prebates into a single wholistic kickback contract.

m) **May 31, 2023**: Plaintiff then requested via recorded voice memo about updates on the pending extension of El-Sergany's new set of credit holds, upfront-payment for new devices, and legal contract language for extension. Plaintiff was terminated minutes after supporting two successful procedures, just one hour before the extension and expansion of PVI's illegal contracts. Goldstein claimed the decision was made by Abbott leadership (documented).

63. Goldstein, upon receiving Ghosh's May 3rd, 2023, report, acknowledged that Abbott's contract "did not sound legal" and told Plaintiff he needs to check with Kubicek as well as with new employer, Abbott, on how to proceed. Rather than remediate the conduct, Defendants continued to scale the

illegal inducements in connection with a multi-state contract expansion with PVI that was executed on May 31, 2023 —Plaintiff was terminated one hour before the extension and expansion of these contracts.

64. All of Ghosh's reports were made for the public good. The illegal schemes Ghosh reported caused or were likely to cause significant unnecessary costs to federal healthcare programs and jeopardized or were likely to jeopardize patient safety through the stimulation of unnecessary medical procedures. Further, Ghosh took corrective action for what he could control, and attempted to change the illegal nature of what he could not control.

65. Defendants were fully aware of Ghosh's reports, as well as his efforts and requests to correct the illegal activity, at the time of his termination. Ghosh had repeatedly made protected reports and requested corrective actions over a period of three months, escalating in frequency and explicitness in the weeks before his termination. Further, both Abbott and CSI were well aware of the sacrifice Plaintiff made to return home to Hawaii to care for his parents in their final years.

**D. Defendants Terminate Ghosh in Retaliation**

66. On May 31, 2023, just four hours after Ghosh sent voice and text messages to Goldstein requesting an update on PVI's contracts and PVI's outstanding balance, Abbott then terminated Ghosh's employment in a nine-minute, unrecorded phone call. They did so directly after spending hundreds of

thousands of dollars, over a 5-month time, to recruit, certify, and relocate Plaintiff to work in Hawaii, knowing his sole purpose of moving back to Hawaii was to care for his terminally ill parents—two healthcare workers who served Hilo, Hawaii for decades.

67. The termination is an obvious retaliatory decision given Defendants spent weeks in preemployment negotiations inducing Ghosh's employment, while competing in a bidding war against two other companies for his services. Defendants expended an enormous amount of time, energy, and resources to hire and certify Plaintiff to perform his role in Hawaii, only to terminate Ghosh, without notice, nor interview, nor explanation, after removing his federally protected reports from his "Final HR file," which was provided by Abbott on June 6th, 2023.

68. Based on information and belief, Dr. El-Sergany demanded that Abbott and CSI terminate Ghosh by end of day on May 31, 2023, or risk losing PVI's business, given Ghosh's months-long efforts to eliminate the illegal inducements flowing to PVI.

69. Defendants fired Ghosh with no warning, no performance improvement plan, no documented grounds, and no written statement of reasons. Ghosh was terminated while driving a rental car to the airport after completing a

two-day hospital assignment on another island that management had assigned to him days earlier.

70. At the time of his termination, Ghosh was exceeding his quarterly sales quotas, had successfully achieved dual certification within three months of onboarding, and had received commendation from teammates, training staff, vendors, and physicians in Hawaii.

71. Ghosh had spent decades covering the "Level-one-trauma" hospitals in Chicago metro, and by former client's documented admissions, was responsible for saving multiple lives. In parity with those credits, during his time with CSI, Ghosh had assisted in averting five life- and limb-threatening clinical events during procedures, including one just minutes before he was terminated.

72. When Abbott's legal department ultimately produced Ghosh's personnel file, it contained no termination-related paperwork, no reports of misconduct by Ghosh, and no documentation supporting any basis for his termination. Defendants also removed his protected reports directly to HR — evidence of his formal certifications — as well as deleting his documented calendar meetings with management. Further, Abbott then reneged on Plaintiff's contract and stripped him of his negotiated employment rights. Further, based on publicly available data through the CMS Open Payment database, Defendants have

apparently erased multiple documented payments to El-Sergany which Plaintiff witnessed in 2023, in direct violation of the Physician Payment Sunshine Act.

73. Not long after Ghosh's termination, Goldstein privately acknowledged to a mutual acquaintance that he had nothing to do with the termination decision and that it had come from above him — and stated that he thought highly of Ghosh and would write him a letter of recommendation. No such letter was ever provided when requested. Based on information and belief, Defendants' leadership prohibited Goldstein from providing a recommendation, in furtherance of their efforts to harm Ghosh's professional standing.

74. Following Ghosh's termination, Defendants promoted Woolsey — whose illegal conduct Ghosh had reported — from Clinical Associate to Sales Representative and continued and expanded their illegal bundling and prebate schemes with PVI in connection with PVI's national expansion into Guam, Maui, Kauai, Hilo, Alaska, and Washington. Abbott kept the one employee who was actually engaged in pervasive illegal activity and conduct which demanded immediate termination for cause.

75. In stark contrast to being a coveted asset in the Medical Device industry prior to employment with CSI, Plaintiff has now been unable to find comparable employment despite repeatedly applying for positions both within Hawaii and outside of the state, for which he is eminently qualified.

76. Defendants non-compete agreement effectively barred Plaintiff from competing in the only industry available to him in Hawaii, leaving him unable to adequately care for his terminally ill parents, with his family's name publicly damaged in the community his parents have served for decades.

77. Importantly, as a Minnesota based company, Defendants refused to cooperate with the Minnesota Department of Labor and Industry's investigation into Plaintiff's illegal termination.

78. Further, State of Hawaii examiner formally concluded that Defendants failed to provide adequate reason for Ghosh's termination and that no cause or misconduct was shown.

79. The ruthless and unfounded nature of Plaintiff's termination has caused severe harm to his income, professional reputation, and emotional wellbeing.

80. Ultimately, Abbott a "healthcare company" sacrificed a family of healthcare workers and former clients, to preserve their national "Profit over Patients" contracts, in order to maximize shareholder value during an SEC merger and defraud the taxpayers of Hawaii during the exact time Maui desperately needed resources to recover from the fires.

**COUNT I**

**Retaliation in Violation of the False Claims Act, 31 U.S.C. § 3730(h)**

81. Plaintiff restates and re-alleges the preceding allegations as though fully stated herein.

82. The False Claims Act, 31 U.S.C. § 3730(h), prohibits employers from discharging, demoting, suspending, threatening, harassing, or otherwise discriminating against an employee in the terms and conditions of employment because of lawful acts taken in furtherance of an action under the False Claims Act or in efforts to stop one or more violations of the Act.

83. PVI routinely used Abbott's and CSI's products and services for patients enrolled in federal healthcare programs, including Medicare. The illegal kickback schemes Ghosh reported — including the illegal bundling contracts, the prebate arrangements, and the retention and use of a former PVI employee as an ongoing inducement — were designed to influence PVI's purchasing of items and services reimbursed by federal healthcare programs, constituting violations of the Anti-Kickback Statute and giving rise to false claims submitted to federal programs, in violation of the False Claims Act.

84. Ghosh engaged in protected activity under 31 U.S.C. § 3730(h) by investigating and reporting conduct that he reasonably believed constituted violations of the False Claims Act and the Anti-Kickback Statute, and by taking active steps — including proposing audits, recommending legally compliant

pricing structures, and escalating reports to company leadership — to stop those violations.

85. Defendants were aware of Ghosh's protected activity. His supervisor acknowledged the illegality of the conduct Ghosh reported. His reports were made directly to supervisory and HR personnel with authority over his employment.

86. Defendants retaliated against Ghosh because of his protected activity by terminating his employment on May 31, 2023, just four hours after his final report.

87. Defendants offered no legitimate, non-pretextual reason for the termination.

88. As a direct and proximate result of Defendants' unlawful retaliation, Ghosh has suffered and continues to suffer lost wages and benefits, lost earning capacity, damage to professional reputation, emotional distress, mental anguish, and other economic and non-economic harm.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Krishnan Ghosh respectfully requests that this Court enter judgment in his favor and against Defendants Abbott Laboratories, Abbott Laboratories, Inc. and Cardiovascular Systems, Inc., and award the following relief:

A. A declaration that Defendants' conduct violated the False Claims Act, 31 U.S.C. § 3730(h);

B. Reinstatement of Plaintiff with the same seniority status he would have had but for the discrimination or equivalent front pay, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained, as provided by 31 U.S.C. § 3730(h)(2);

C. Compensatory damages for all economic losses, including lost wages, lost benefits, and lost earning capacity;

D. Compensatory damages for emotional distress, mental anguish, humiliation, and reputational harm;

E. Attorneys' fees and costs of litigation as authorized by 31 U.S.C. § 3730(h)(2);

F. Prejudgment and post-judgment interest at the maximum lawful rate; and

G. Such other and further relief as the Court deems just and proper.

DATED: Honolulu, Hawaii, May 29, 2026.

/s/ Joseph T. Rosenbaum
ELIZABETH JUBIN FUJIWARA
JOSEPH T. ROSENBAUM
Attorneys for Plaintiff
KRISHNAN GHOSH

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| KRISHNAN GHOSH,<br><br>Plaintiff,<br><br>vs.<br><br>ABBOTT LABORATORIES, ABBOTT LABORATORIES, INC, and CARDIOVASCULAR SYSTEMS, INC; JOHN DOES 1-10; JANE DOES 1-10; DOE CORPORATIONS 1-10; DOE PARTNERSHIPS 1-10; DOE UNINCORPORATED ORGANIZATIONS 1-10; and DOE GOVERNMENTAL AGENCIES 1-10,<br><br>Defendants. | CIVIL NO.<br>(Other Civil Action)<br><br>DEMAND FOR JURY TRIAL |

DEMAND FOR JURY TRIAL

Comes now, Plaintiff KRISHNAN GHOSH, by and through his attorneys, Elizabeth Jubin Fujiwara and Joseph T. Rosenbaum at Fujiwara and Rosenbaum, LLLC and hereby demands trial by jury on all issues triable herein. This demand is made pursuant to Rule 38(b) of the Federal Rules of Civil Procedure and the records and files herein.

DATED: Honolulu, Hawaii, May 29, 2026.

/s/ Joseph T. Rosenbaum
ELIZABETH JUBIN FUJIWARA
JOSEPH T. ROSENBAUM
Attorneys for Plaintiff
KRISHNAN GHOSH